## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR
## A CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Jeffrey T. Burke, being duly sworn, depose and state:

### Introduction and Agent Background

1.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.     I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since January 2023. I am currently assigned to the Boston Office of the New England Field Division.  Prior to becoming a DEA Special Agent, I completed 16 weeks of training at the DEA Office of Training, located in Quantico, Virginia. My training included classroom preparation in drug trafficking networks, drug identification, as well as practical application of surveillance, drug investigation, and arrest procedures.  Prior to that, I was a Federal Police Officer for the Pentagon Force Protection Agency ("PFPA") in Arlington, Virginia, from February 2009 to October 2015. In October 2015, I was promoted to a Special Agent with the PFPA and worked in this position from October 2015 to January 2023.

3.     During my time as a Federal Police Officer and Special Agent, I have participated in investigations and arrests involving violations of federal laws, including Title 21, United States Code, Sections 841 & 846.  I have participated in many aspects of drug investigations, including interviews and debriefings of individuals involved in drug trafficking.  I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  Additionally, I am familiar with the methods of use, effects, distribution, appearance, as well as the methods of manufacture of controlled substances.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating sources, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the way illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the way narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business to prevent detection and often use text messages in lieu of phone calls to avoid speaking over the telephone.

6. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the way narcotics traffickers use personal and rented cars and trucks, common carriers, mail and

private delivery services, and a variety of other motor vehicles to: (a) meet with co- conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

7.       More broadly, based upon my training and experience, tracking drug traffickers frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

**Purpose of Affidavit**

8.       I submit this affidavit in support of an application for a criminal complaint against Robert COLON, a/k/a "NEW YORK" ("COLON") charging that on or about September 22, 2025, in Revere, and on or about October 6, 2025, in Revere, COLON distributed and possessed with intent to distribute a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (the "Charged Offenses").  In addition to the Charged Offenses, the DEA is also investigating COLON for violations of 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute controlled substances).  This offense along with the Charged Offenses are collectively called the "Target Offenses."

9.       I also submit this affidavit in support of an application for a warrant authorizing law enforcement to search the person of Robert COLON, any cellular telephones in his custody or control including the cellular telephones assigned 917-501-1997 (the "1997 Phone"), 917-272-

6771 (the "6771 Phone"), 347-760-4702 (the "4702 Phone"), and any bags or items in his custody or control, as described in greater detail below and in Attachment A, for evidence of the Target Offenses as further described in Attachment B. which is incorporated by reference.

### Probable Cause

10.     In June 2025, a cooperating source ("CS-1") provided information about Robert Rumaldo COLON, a/k/a "NEW YORK," a drug trafficker who sells counterfeit pills containing methamphetamine and other controlled substances including fentanyl.[1]  CS-1 provided a telephone number 917-501-1997 (the "1997 Phone"), that s/he used for previous drug transactions with COLON.  COLON has a criminal history that includes convictions for drug and gun offenses. Most recently, COLON was convicted in 2021 in Woburn District Court of intimidation, larceny, and assault and battery on a family/household member for which he received a 2.5-year sentence with 18 months committed and the balance suspended.

11.     Investigators directed CS-1 to contact COLON to set up controlled purchases of counterfeit pills containing methamphetamine.

*July 2, 2025: COLON Sold CS-1 200 Counterfeit Pills Containing Methamphetamine*

12.     On July 2, 2025, CS-1 contacted COLON at the 1997 Phone and arranged a purchase of 200 counterfeit Adderall pills.  In preserved text messages via Signal, COLON wrote among other things, "Lmk if need me bring that I have 2 [orange emoji] left . . . if you grab 200 I'll do 380 . . . These things everyone loves."  Based on my training, experience, and knowledge of this investigation, COLON was referring to fake Adderall pills, which are typically orange, and

---

[1] CS-1 has a criminal history that includes arrests and convictions for distribution of controlled substances and possession with intent to distribute controlled substances.  CS-1 is cooperating with investigators voluntarily; the potential of future monetary compensation was also discussed with CS-1.  CS-1 previously provided information to law enforcement that led to the seizure of firearms and drugs and led to a criminal conviction.  Based on information provided in that investigation and in this one, investigators believe CS-1's information is reliable.

offering to sell them to CS-1 for $380.   At investigators' direction, CS-1 arranged to meet with

COLON on July 2, 2025, at a Home Depot in Chelsea, Massachusetts.

13.    On July 2, investigators searched CS-1 and CS-1's vehicle for contraband and

found none.  Investigators gave CS-1 $380 in official money to buy the pills and directed CS-1 to

travel to the Home Depot; CS-1 did so while being surveilled by investigators.

14.    At about 4:25 p.m., COLON arrived at the Home Depot driving a black Mercedes

(the "black Mercedes").  Investigators photographed COLON in the parking lot.



CS-1 entered the black Mercedes.  The car drove around the parking lot and at one point entered

the McDonald's drive thru.  Inside the black Mercedes, COLON provided CS-1 with two knotted

plastic bags containing orange pills.  CS-1 provided COLON with the $380.

15.    After the deal, CS-1 exited the black Mercedes, entered CS-1's vehicle and drove

to a neutral location while under investigators' surveillance.  Investigators met with CS-1 at the

neutral location, and CS-1 relinquished the pills he got from COLON.  The pills were later tested

at a DEA laboratory and found to be 197 pills containing methamphetamine and weighing 53.682 grams.

16.     On July 23, 2025, investigators obtained a warrant for location information for the 1997 Phone and to install a GPS tracking device on the black Mercedes. M.J. Nos. 25-1197, 1198-DLC (under seal). By then, the 1997 Phone had fallen into apparent disuse by COLON and no data was received. Investigators affixed a GPS tracking device to the black Mercedes, but COLON found the device, smashed it, and threw it in the Neponset River. COLON told CS-1 he did so in a recorded discussion. Investigators later recovered the smashed device from the river.

*July 24, 2025: COLON Met CS-1 in Revere in Order to Sell CS-1's "Associate," an Undercover Officer, 1,000 Pills. COLON Aborted the Deal.*

17.     CS-1 provided investigators a second phone number, 917-272-6771 (the "6771 Phone") that CS-1 had for COLON. On July 24, 2025, investigators directed CS-1 to attempt to introduce an undercover officer ("UC") to COLON. CS-1 was to introduce the UC as a drug customer looking to buy 1,000 counterfeit Adderall pills. CS-1 contacted COLON on the 6771 Phone and the two had recorded discussions. COLON balked at one of the meeting locations proposed by CS-1 because it was near the "State Police barracks . . . the whole street is full of State Police . . . I don't see [customers] there for that amount [of drugs], it's just not safe." COLON further stated, "this is not something that we're just gonna do [at a] random place . . . this is a big amount." CS-1 said, "a lousy thousand Add?" COLON responded, "do you know how much time [in prison] you can get for that? Are you alright? . . . it's not worth it . . . [the UC is] not buying two or three singles, this a big amount." COLON eventually agreed to meet CS-1 at another location in Revere.

18.     On July 24, investigators searched CS-1 and CS-1's vehicle for contraband and found none. Investigators directed CS-1 to travel to the meeting location with the UC.

Investigators surveilled CS-1 and the UC as they drove to the meeting location. Investigators established surveillance around the meeting location.

19.    COLON arrived at the meeting location at about 6:00 p.m. driving the black Mercedes. COLON parked and approached CS-1's vehicle, which contained CS-1 and the UC. As COLON approached, the UC called out COLON's location and description to investigators over an audio/visual device. Unintentionally, the UC's voice was apparently captured on CS-1's phone while CS-1 was talking to COLON. When COLON arrived at CS-1's vehicle, COLON asked the UC who the UC was talking to. COLON challenged the UC and implied the UC was law enforcement. COLON declined to conduct the pill sale with the UC. COLON then walked away towards the black Mercedes.

*September 22, 2025: COLON Sold 1,000 Counterfeit Adderall Pills to CS-1*

20.    CS-1 provided investigators a third phone number, 347-760-4702 (the "4702 Phone") that CS-1 had for COLON. On August 25, 2025, investigators obtained a warrant for location information for the 4702 Phone. M.J. No. 25-1261-DLC (under seal).

21.    On September 18, 2025, at investigators' direction CS-1 contacted COLON on the 4702 Phone to arrange a controlled purchase of 1,000 counterfeit Adderall pills from COLON. Starting at approximately 1:40 p.m., CS-1 called the 4702 Phone and had recorded discussions with COLON setting up the buy. CS-1 asked for 1,000 of "the ones that day when we were down . . . at Home Depot," meaning the counterfeit Adderall pills CS-1 bought from COLON on July 2, 2025. COLON chastised CS-1 for calling him on a regular phone instead of an encrypted application, stating "let that be the last time you talk on the phone about anything . . . just tell me 'hey, New York, come pull up on me.' . . . the phone's not a communication for details or nothing like that, unless you wanna go back, ya know, away [to prison]. . . . We don't know who's on the other line. . . . you gotta get the Signal thing; there, we can talk all day, not on this." COLON

agreed to come to a house in Revere. COLON used the 4702 Phone to text CS-1, "Make sure u have cash bud . . . we can't play monopoly." COLON did not arrive that evening; CS-1 chastised COLON in recorded voicemail and text messages.

22.    The next day, September 19, at approximately 11:53 a.m., COLON used the 4702 Phone to text CS-1, "All set . . . Call asap." COLON texted that he was coming to the house in Revere, and later, that he was there. CS-1 had her/his phone off at investigators' direction. No deal occurred that day.

23.    On September 22, 2025, at approximately 1:05 p.m., at investigators' direction CS-1 called COLON on the 4702 Phone. CS-1 chastised COLON for not showing up on September 18. COLON agreed to meet CS-1 at around 2:00 p.m. and provide "1," meaning 1,000 fake Adderall pills. COLON instructed CS-1 to call COLON on Signal. Investigators set up a Signal account on CS-1's new phone and inputted the 4702 Phone into Signal. The 4702 Phone returned a Signal profile of "It's me."

24.    In a subsequent unrecorded video call on Signal, CS-1 and COLON agreed for COLON to meet CS-1 and sell CS-1 the "oranges." The meeting was set for a residence in Revere.

25.    Investigators searched CS-1, the garage at the house in Revere, and the surrounding area for contraband without finding any. Investigators set up a covert audio/visual recording device in the garage, and a live-streaming audio/visual device on CS-1's person. Investigators gave CS-1 $1,500 official money to do the deal and instructed CS-1 to tell COLON that CS-1 was keeping $250 as a broker fee to CS-1's customer, which CS-1 would in fact return to investigators.

26.    At approximately 5:39 p.m., investigators saw the black Mercedes arrive near the house in Revere. About a minute later, investigators photographed COLON walking down the street toward CS-1's residence holding a red bag.

27.    COLON arrived at the house in Revere at about 5:44 p.m. and met with CS-1 in the garage.  The covert video captured COLON's face meeting with CS-1.



Additionally, at 5:47 p.m., location information for the 4702 Phone placed the phone approximately 0.2 miles from the house in Revere with a 2,278-meter uncertainty radius.

28.    Following the meeting, investigators saw the black Mercedes driving around the area and inferred that COLON had been dropped off by another person.  At approximately 6:11 p.m., an investigator saw COLON get into the passenger seat of the black Mercedes.  Investigators followed the car as it drove toward Lynn, Massachusetts.

29.    Investigators met with CS-1, who provided investigators with orange pills that CS-1 received from COLON.   Investigators performed a field test of the pills, and the result was positive for methamphetamine, as depicted below:



30.    Laboratory analysis of the pills is pending.  Based on the positive field test result; the color, appearance, and pricing of the pills; and the fact that similar pills previously provided to CS-1 by COLON on July 2 tested positive at a laboratory for methamphetamine, I believe laboratory analysis of these pills will reveal the presence of methamphetamine.

31.    The gross weight of the pills, including packaging, was approximately 317.65 grams.  I believe, based on laboratory analysis of the July 2 pills, that COLON's pills weigh approximately 0.272 grams per pill.  I therefore believe the 1,000 pills COLON provided CS-1 on September 22 will be found to weigh approximately 272 grams.

*October 06, 2025: COLON Sold 1,500 Counterfeit Adderall Pills to CS-1*

32.    On October 1, 2025, investigators obtained another warrant for location information for the 4702 Phone.  M.J. No. 25-1341-DLC (under seal).

33.    On October 4, 2025, at investigators' direction CS-1 contacted COLON via Signal to arrange a controlled purchase of 1,500 counterfeit Adderall pills from COLON.  CS-1 and

COLON had an unrecorded discussion on Signal in which COLON agreed to sell 1,500 pills to CS-1 for $2,250. The two agreed to meet on October 6, 2025, at the same house in Revere as the prior deal.

34.    On October 6, 2025, investigators met with CS-1 and searched her/him, the garage at the house in Revere, and the surrounding area for contraband without finding any. Investigators set up a covert audio/visual recording device in the garage, and a live-streaming audio/visual device on CS-1's person. Investigators gave CS-1 $2,500 official money to do the deal and instructed CS-1 to tell COLON that CS-1 was keeping $250 as a broker fee, which CS-1 would in fact return to investigators.

35.    At approximately 4:00 p.m., COLON told CS-1 in an unrecorded discussion on Signal that he would be there around 5:00 p.m.

36.    At approximately 8:53 p.m., investigators located a white Tesla (Mass. Reg. 4HSD48) (the "white Tesla") that investigators previously saw COLON operating, parked in front of the Revere House of Pizza. Investigators photographed COLON and an unidentified man exiting the restaurant at approximately 9:06 p.m. COLON was wearing a white shirt, white pants, and a backwards New York Yankees cap. Investigators saw COLON enter the driver's seat of the white Tesla; the unidentified man got into the passenger seat.

37.    At approximately 9:25 p.m., investigators saw the white Tesla driving towards the house in Revere where the deal would occur. COLON arrived the house at about 9:27 p.m. and met with CS-1 in the garage. The covert video captured COLON's face meeting with CS-1. CS-1 was wearing the same clothing investigators saw him wearing moments earlier at the Revere House of Pizza.





38.     CS-1 asked COLON, "how many is there?"  COLON responded, "15," meaning 1,500 pills. CS-1 handed COLON $2,240, stating COLON owed CS-1 $10, and COLON counted the money.

39.     Following the meeting, investigators saw the white Tesla drive away from the house at approximately 9:36 p.m.

40.     Investigators met with CS-1, who provided investigators with orange pills that CS-1 received from COLON.   Investigators performed a field test of the pills, and the result was positive for methamphetamine.



41.     Laboratory analysis of the pills is pending.  Based on the positive field test result; the color, appearance, and pricing of the pills; and the fact that similar pills previously provided to CS-1 by COLON on July 2 tested positive at a laboratory for methamphetamine, I believe laboratory analysis of these pills will reveal the presence of methamphetamine.

42.     The gross weight of the pills, including packaging, was approximately 331.06 grams.  Because the gross weight of these pills was similar to the 1,000 pills COLON provided CS-1 on September 22, I believe COLON "shorted" CS-1, meaning he provided CS-1 fewer than 1,500 pills.

43.     In a subsequent recorded phone call via Signal, CS-1 challenged COLON for "shorting" CS-1.  COLON admitted that he did not weigh the pills and that he got them from a "buddy" who was a "white kid."  COLON agreed that the pills he provided were at least 200 pills short.  COLON agreed to provide the 200 pills at a later date.  Based on the above, I believe

COLON sold CS-1 approximately 1,300 pills and that the pills will be found to weigh approximately 353 grams (1,300 * 0.272).

*October 17, 2025: COLON Flew to Mexico with the 4702 Phone*

44.     On October 17, 2025, location information for the 4702 Phone began returning "absent subscriber" with no location.  Investigators learned that on October 17, 2025, COLON flew on American Airlines from Boston to Mexico, via Dallas.  Based on my training, experience, and familiarity with this investigation, including the fact that the 4702 Phone began returning "absent subscriber" when COLON went to Mexico, I believe COLON has the 4702 Phone, and possibly other phones described above, with him in Mexico.

45.     In a subsequent recorded discussion with CS-1 on Signal on October 20, 2025, COLON acknowledged being in Mexico and stated, in sum and substance, that he was negotiating kilogram-level deals with individuals in Mexico.  Based on my training, experience, and familiarity with this investigation, COLON may return to Boston with evidence of those drug negotiations, including drugs or money, in his luggage.

46.     COLON is scheduled to return to Boston via JetBlue on the evening of October 22, 2025.

**Probable Cause to Believe That the Person of COLON, Including Cellphones and Bags or Items in His Custody or Control,  Contain Evidence, Fruits, And Instrumentalities**

47.     Based on my training, experience, and the facts set forth in this affidavit and in Attachment A, there is probable cause to believe that the person of COLON, including cellphones and bags or items in his custody or control, likely will contain evidence, fruits, and instrumentalities of the Target Offense.

48.     Based on my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about,

and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages (such as through social media sites like Snapchat); scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information, including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

49. From my training, experience, and information provided to me by other agents, I am aware that individuals who engage in drug trafficking frequently use computer equipment, including cell phones, hard drives, video cameras, and GPS, to facilitate their illegal activities, including by communicating with other members of the drug trafficking organization, their associates, and customers, as well as conducting surveillance and counter-surveillance in furtherance of their objectives and to protect the proceeds of their illegal activities. Individuals engaged in drug trafficking often utilize cell phones to arrange transactions, including taking orders specifying the type and quantity of a controlled substance and negotiating the price, time, date, and location of a drug transaction. Individuals involved in drug trafficking often take photographs and/or videos of their current drug supply to share with customers to entice them into drug transactions.

50. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, utilizing social media applications and messengers, and storing a vast range and amount of electronic data. Examining

data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

51.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

52.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

   a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

   b.   Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

   d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

53.     Based on my knowledge, training, experience, and information provided to me by other agents, I also know that Mexico is a source area for narcotics, including methamphetamine. I also know that drug traffickers who travel to Mexico may carry evidence of drug trafficking, including drugs or drug proceeds, in their luggage.

## Conclusion

54.     Based on the information set forth above, I believe probable cause exists to conclude that on or about September 22, 2025, in Revere, and on or about October 6, 2025, in Revere, COLON distributed and possessed with intent to distribute a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), the Charged Offenses. I further believe probable cause exists to believe that evidence of the commission of the Target

Offenses will be found on the person of COLON, including cellphones, bags, and other items in his custody or control.

Respectfully submitted,

Jeffrey T. Burke
Special Agent
Drug Enforcement Administration

Subscribed and sworn via telephone in accordance with Fed. R. Crim. P. 4.1 on this 22nd day of October 2025.

HON.  DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Person and Property to be Searched

The person and property to be searched are:

Target Subject Robert COLON, a/k/a "NEW YORK" (DOB xx/xx/1989, SSN xxx-xx-7574), any cellular telephones in his custody or control including the cellular telephones assigned 917-501-1997, 917-272-6671, and 347-760-4702, and any bags or items in his custody or control.

Target Subject COLON is described as a male, approximately 36 years old, 6'1" tall, weighing approximately 230 pounds, with black hair and brown eyes. Target Subject COLON is depicted below:



## ATTACHMENT B

### I.    Items to Be Seized

The items to be seized from the person of Robert COLON a/k/a "NEW YORK," consist of evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to commit same), from June 1, 2025, through the date of signing of this warrant, described as follows:

1. Materials, equipment and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, drug pressing machines, storage bins, containers, cutting agents, and scales.

2. Documents containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, wire transfer documents, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3. Items evidencing the proceeds derived from illicit drug trafficking, including but not limited any of the following when found in proximity to controlled substances: large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

4. All documents and other materials evidencing the shipping or receipt of packages to or from Robert COLON, including but not limited to invoices, waybills, packaging

materials, postage meters, FedEx boxes, UPS boxes, USPS boxes, and account statements for accounts held at FedEx, UPS, the USPS, DHL, or other shipping companies.

5. All documents evidencing or relating to foreign or domestic travel of Robert COLON or his co-conspirators, including but not limited to airline tickets and tickets for other means of transport, written directions to a location, and United States and foreign customs declaration receipts and forms.

6. <u>Cell Phones or other electronic equipment identified as used by or belonging to Robert COLON:</u> All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking by Robert COLON and his coconspirators, located in the memory of any mobile telephone belonging to or identified as being used by Robert COLON, including but not limited to the cellular telephones assigned 917-501-1997, 917-272-6771, and 347-760-4702,  and described as the mobile telephones':

    a. Incoming call history;

    b. Outgoing call history;

    c. Missed call history;

    d. Outgoing text messages;

    e. Incoming text messages;

    f. Draft text messages;

    g. Telephone book;

    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

j. Voicemail;

k. User-entered messages (such as to-do lists, notes, and reminders);

l. Browser messages and/or internet communications (*e.g.*, e-mail; text messages) both to and from the cellular telephone (including any in draft form) relating to or referencing narcotics trafficking;

m. Photographs; and

n. Any passwords used to access the electronic data described above.


## II.     Search and Seizure of Electronically Stored Information

The items to be seized from the person of Robert COLON also include any cellphones, computer devices, and storage media that are reasonably believed to be owned or used by Robert COLON and that may contain any electronically stored information falling within the categories set forth in this Attachment above, including, but not limited to, cellphones, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the person of Robert COLON are:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption

devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section II of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Robert COLON the display of any physical biometric characteristics necessary to unlock any device found on the person of COLON, including to (1) press or swipe the fingers (including thumbs) of COLON to the fingerprint scanner of the device(s); (2) hold the device(s) in front of COLON's face to activate the facial recognition feature; and/or (3) hold the device(s) in front of COLON's face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant. Law enforcement personnel may only use reasonable force to perform these unlocking activities.